IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-1993-RPM

ANTHONY MARTINEZ

Plaintiff,

v.

PATRICK BACKER;
CHERYL HERRERA;
MATTHEW MITCHELL; and
THE UNITED STATES OF AMERICA

Defendants.

---

## AMENDED COMPLAINT

---

Plaintiff, Anthony Martinez, by and through his attorney, Raymond K. Bryant of the Civil Rights Litigation Group, PLLC, hereby asserts the following facts and claims against the individual and governmental Defendants, as follows:

### INTRODUCTION

1.      This is a federal civil rights and tort claims act (FTCA) action seeking a remedy for injuries suffered by Plaintiff for the negligent, reckless, and/or intentional conduct of named tribal police officers ("Defendant Officers"), when they approached Plaintiffs home in stealth, under cover of night, to conduct a purported "knock and talk." The conduct caused Plaintiff to believe he and his property were being threatened and caused a confrontation involving the intruding officers, wherein Plaintiff was ultimately shot in the back.

2.      Instead of openly and conspicuously approaching Plaintiff's home to ask questions about an earlier altercation that purportedly occurred at a gathering at Plaintiff's home,

Defendant Officers attempted a dangerous, surprise contact with Plaintiff that caused him to believe that he and his home were under attack. Defendant Officers covertly approached Plaintiff's home, in a rural area where there are no streetlights, around 3:00 a.m., while wearing black police gear, and driving in a dark SUV, in order to conceal their identities and purpose. Plaintiff observed the SUV slowly drive by his home with all of its lights "blacked out" and park near the dead-end of an uninhabited street, and then watched as a group of darkly clad, aggressive-looking figures gathered from the SUV and walked toward his home. Plaintiff did not know these person were police officers; their suspicious, aggressive-looking, stealth approach caused Plaintiff to believe that these darkly-clad figures were the same assailants who had earlier started a fight at his home; he feared they were returning to harm he and his guests. After the shadowy group walked along the curtilage of his home, towards him, Plaintiff jumped out of a bush on his property and yelled while holding a child-sized baseball bat in the desperate hope that alerting the intruders that their stealth had been detected would scare them away. Almost immediately after he jumped out, firearms and flashlights were pointed at him, and he turned and ran back to his home. The officers did not identify themselves as officers of the law. As he ran away from the assailants, one of the officers opened fire, shooting Mr. Martinez in the back.

3.      Plaintiff's life was saved by emergency medical technicians who transported him to the hospital via flight-for-life. But Plaintiff's nightmare did not end there. Defendant Officers collectively misrepresented the truth with regard to the incident in charging documents and in subsequent statements and interviews to superficially cover-up and conceal their unjustified approach and latent use of force. As a result, the officers caused Mr. Martinez to be unjustifiably prosecuted and tried for "attacking" police officers, even though it would have been clear to any reasonable person that he was only trying to defend himself and his home.

4.      Since Defendant Officers were operating pursuant to a funding agreement

between the Southern Ute Tribe and the Bureau of Indian Affairs at the times relevant to the events giving rise to this action, this Court has concluded that Defendant United States of America is the true party in interest concerning the state law claims asserted and may be held vicariously liable for the individual officers' tortious conduct under a theory of *respondeat superior*, in accordance with the relevant provisions of FTCA. Plaintiff, thus, directs the negligence claims against Defendant USA.

## JURISDICTION AND VENUE

5.      This action arises under the Constitution and laws of the United States, 42 U.S.C. § 1983 and the Federal Tort Claims Act ("FTCA"). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 & 1346(b).

6.      Venue is proper pursuant to 28 U.S.C. § 1402(b) because the incidents and resultant injuries to Plaintiff giving rise to this action occurred in the City of Ignacio, County of La Plata, Colorado.

7.      Plaintiff has exhausted his administrative remedies in compliance with 28 U.S.C. § 2675(a). On November 20, 2014, Plaintiff filed a Standard Form 95 administrative tort claim against the United States with the Department of the Interior. On March 13, 2015, Plaintiff's claim was denied.

## PARTIES

8.      Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

9.      Plaintiff Anthony Martinez was, at all times relevant to this Complaint, a resident and citizen of the State of Colorado, not a native Indian of the area tribe, and resided at 189 County Rd. 320B, in Ignacio, La Plata County, Colorado.

10.     Defendant Officer Patrick Backer was, at all times relevant to this Complaint,

3

employed as a law enforcement officer by the Southern Ute Tribe pursuant to a Public Law 93-638 contract ("638 contract") with the United States Bureau of Indian Affairs (BIA), empowered under that contract to enforce federal, state, and tribal law, and acted within the scope of that employment contact to enforce Colorado law. Pursuant to Order of this Court, while acting in this capacity, he was acting under color of federal law, consistent with *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and is hereby identified in his individual capacity.

11.    Defendant Officer Cheryl Herrera was, at all times relevant to this Complaint, employed as a law enforcement officer by the Southern Ute Tribe pursuant to the relevant 638 contract with the BIA, empowered under that contract to enforce federal, state, and tribal law, and acted within her scope of employment. Pursuant to Order of this Court, while acting in this capacity, she was acting under color of federal law consistent with *Bivens* and its progeny, and is hereby identified in her individual capacity.

12.    Defendant Officer Matthew Mitchell was, at all times relevant to this Complaint, employed as a law enforcement officer by the Southern Ute Tribe pursuant to the 638 contract with the BIA, empowered under that contract to enforce federal, state, and tribal law, and acted within his scope of employment. Pursuant to Order of this Court, while acting in this capacity, he was acting under color of federal law consistent with *Bivens* and its progeny, and is hereby identified in his individual capacity. Defendant Backer possessed a SLEC issued by the BIA.

13.    Defendant United States of America, at all times relevant to this Complaint, through the BIA and the Department of Interior, had entered into the 638 contract with the Southern Ute Tribe to fund a tribal police department for the provision of law enforcement services and to authorize the enforcement of federal, state, and tribal law. The provisions of the 638 contract and federal law dictate that tribal officers are covered employees when performing

work under the contract for the purposes relating to the Federal Tort Claims Act. Pursuant to Order of this Court, The United States is responsible for the negligent or wrongful acts or omissions of these officers, and is hereby identified in lieu of the individual Defendants regarding such negligence claims, pursuant to the relevant FTCA provisions and waivers of immunity.

## FACTUAL BACKGROUND

14.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

15.     On December 5, 2012, Plaintiff Anthony Martinez invited a few friends to his home to drink and socialize.

16.     At some point in the evening, a fight broke out between two men, which spilled onto Plaintiff's front yard. The fight temporarily subsided, but escalated when one of the men left to get friends in order to "jump" the other man, who remained at the gathering.

17.     After four men arrived back at the house and circled Andrew Rossi, to "jump" him, Plaintiff stepped in to defend Mr. Rossi and his home from the aggressive intruders. The intruders were eventually scared off when Plaintiff exclaimed that he was "going to get the bats."

18.     Shortly thereafter, the intruders called the police and falsely claimed that Plaintiff and Mr. Rossi had started a fight

19.     Because Plaintiff was not a member of the Southern Ute Tribe, and because Plaintiff's home was not on tribal land, the intruders' complaint was routed to the La Plata County Sheriff's Office.

20.     The La Plata County Sheriff's Office had a policy and practice of utilizing Southern Ute Police Department officers to perform state law enforcement functions in the area to which it was responsible. In conformity therewith, the La Plata County Sheriff's Office

directed Defendant Officers to Plaintiff's residence to conduct a "knock and talk" regarding suspected crimes relating to the altercation.

21.     Plaintiff's residence is one of only two inhabited homes in what is essentially an abandoned, rural part of town that is surrounded by extended curtilage and empty fields, many of which belong to Plaintiff's/Plaintiff's family. The area is pitch-black at night, with no streetlights or other lighting to illuminate vehicles or people.

22.     At approximately 3:00 a.m., Defendants Backer and Herrera drove a darkly colored vehicle towards Plaintiff's residence. They formulated a plan to conceal themselves and approach the house using stealth, under cover of night, in an attempt to surprise Plaintiff and/or to surreptitiously attempt to collect evidence of suspected state crimes.

23.     Defendants Backer and Herrera drove past Plaintiff's residence with their headlights, running lights, and police lights "blacked out." They drove down the street and waited near a dead-end for Defendant Mitchell to meet them.

24.     Approximately five minutes later, Defendant Mitchell joined and participated in Defendant Backer and Herrera's plan to make contact by stealth. He drove a dark colored SUV. He turned off all of his vehicle's headlights, running lights, and police lights, before slowly driving past Plaintiff's residence, without announcing or identifying himself as a police officer, in a clandestine manner, and then met with the other two officers.

25.     When Defendant Mitchell drove past the residence, two of Plaintiff and/or his guests noticed that the SUV drove conspicuously slow, turned off its lights, appeared to watch the home for a moment, and then continued down the virtually-abandoned street toward the dead-end.

26.     In the blackness of night, Defendant Mitchell's SUV appeared highly similar to the dark SUV driven by the assailants who had earlier tried to "jump" Andrew Rossi. The

officers' size, statute, and appearance similar to that of the earlier assailants.

27.     The Defendant officers' behavior was starkly different than an approach made by officers earlier in the evening, which involved: officers in standard police uniform, who parked directly in front of the home, with lights illuminated so that they and their vehicles could be clearly identified, and where the officers walked to the front door, knocked and announced themselves as police officers, and ultimately left when there was no response.

28.     Due to the officers' efforts to hide their presence and identifies as a police officers, Plaintiff believed that they were the assailants who had started a fight earlier that evening, returning for revenge. Plaintiff feared that they would try to sneak onto his property, surprise him, and cause serious bodily injury or worse. As such, Plaintiff obtained a child-sized baseball bat, which he had earlier referenced to scare off the intruders in order to defend himself from the imminent threat. Plaintiff then watched the darkly clad group as the officers approached.

29.     Plaintiff and Rossi watched from Plaintiff's yard as a group of three or four darkly-clad, aggressive-looking figures appeared to meet at a dead end near his home, exit a dark SUV, and began walking toward plaintiff's home, in the opposite direction of the only other inhabited residence in the area. The figures walked along the edge of Plaintiff's yard and the adjacent passageways and other property belonging to he and his family, obviously directed toward Plaintiff's residence, until they were close enough that Plaintiff feared the figures might corner them on his property.

30.     In a final hope to avoid confrontation, Plaintiff decided to alert the intruders that they had been noticed and that they could not threaten surprise physical violence. Plaintiff demonstrated that he had "got[ten] the bat(s)" that earlier had scared off intruders. He momentarily ran toward them while yelling with the baseball bat in hand.

31.     The figures pulled their firearms and aimed them at Plaintiff, yelling out to "drop the bat" and "put it down." They never communicated that they were police officers, and Plaintiff did not recognize them as such.

32.     Plaintiff was momentarily blinded by flashlights shone on his face and chest. Almost immediately, he abandoned his advance and turned back and retreated toward his house.

33.     As Plaintiff ran away, Defendant Backer shot at Plaintiff twice, striking Plaintiff once in the back.

34.     Together, the officers cooperatively seized and handcuffed Plaintiff and other persons in Plaintiff's home. They each made statements/assertions and/or otherwise procedurally participated in the steps required to assert baseless criminal charges against Mr. Martinez.

35.     The Defendant Officers coordinated oral and written statements to protect Defendant Backer and their department, while charging Plaintiff with crimes they knew or should have known that Plaintiff did not commit.

36.     To cover-up the fact that they had concealed themselves and their identities, they claimed that they had all clearly identified themselves verbally as police officers before the shooting.

37.     Instead of acknowledging that Defendant Backer had fired after Plaintiff ceased his advance and had turned around, they each gave statements indicating that Plaintiff continually advanced upon them, and never turned back, even as Defendant Backer fired his weapon twice.

38.     Defendant Officers thought they observed bullet wounds on Plaintiff's left side, which information they used to quickly adapt untrue details to their police statements by claiming that Plaintiff appeared as though he was positioned to swing the bat like a baseball player at the moment Defendant Backer shot him in Plaintiff's side.

39.     The La Plata County prosecutor relied on Defendant Officers' statements in criminally prosecuting Plaintiff for assault on a police officer and menacing.

40.     However, trial evidence and testimony including that of the emergency room physician(s) provided indisputable evidence that vindicated Plaintiff at the end of the criminal trial. Physician(s) testified that the bullet wound trajectory entered through Plaintiff's back, thereby proving Plaintiff was shot in the back and not his front or side, and could not have continually advanced and positioned himself like a baseball player ready to swing when Defendant Backer shot him.

41.     Plaintiff was inevitably found not guilty of the alleged crimes after a jury trial on or about May 13, 2014.

42.     Plaintiff seeks compensation for his physical injuries, loss of liberty, pain and suffering, disability, severe emotional distress, PTSD, humiliation, fear, anguish, helplessness, dignitary injuries, loss of enjoyment of life, and economic damages caused by the Defendant Officer's negligent, reckless and/or intentional acts, which caused him to fear for his life and to defend himself, his guests, and his property under the circumstances where Plaintiff reasonably perceived an imminent threat by the officers.

### FIRST CLAIM FOR RELIEF
*Bivens - Federal Fourth Amendment Violation – Excessive Force*
**(Against Defendant Officer Backer, Herrera, and Mitchell)**

43.     Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

44.     Defendant Officer Backer intentionally and knowingly applied unnecessary, unreasonable, and excessive force to Mr. Martinez by shooting him in the back, as Mr. Martinez fled from what appeared from the circumstances to be a darkly clad group of vengeful assailants.

45.     Defendant officers Backer, Herrera, and Martinez contributed to the use of the unnecessary, unreasonable, and excessive force through their reckless conduct preceding the incident, which created the circumstances under which Mr. Martinez and (possibly) the officers were positioned to perceive the other was a probable assailant. Specifically, the officers coordinated and followed a plan to approach Plaintiff's home in a manner inconsistent with the appearance or conduct of any legitimate police authority; the officers approached Plaintiff's home, *inter alia*:

- Extremely late, at or about 3:00 a.m.;
- Under cover of darkness, at a location that has no ambient lighting from houses or streetlights;
- Wearing all-black, dark tactical police gear;
- After slowly driving past Plaintiff's house with all SUV lights "blacked out," in what appeared as a suspicious attempt to surreptitiously scope out the home and its inhabitants;
- By parking and meeting with each other in a suspicious, manner, toward the dead-end of the virtually abandoned street;
- Sneaking along the curtilage of Plaintiff's property in stealth, towards his home and away from the only other inhabited house on the street;
- By beaming their flashlights at Plaintiff's eyes;
- By unreasonably failing to identify themselves as police officers;
- And otherwise attempting to conceal their identities, movements, and locations throughout the entire sequence of the incident;
- While possessing knowledge that Plaintiff had previously been involved and/or broken up a fight with intruders from whom he might reasonably fear serious bodily injury and who had been scared off by his threat to "get the bats."

46.     With knowledge that they would not readily be recognized in black tactical police clothes, the officers made themselves look more like invading thugs than police, which led Plaintiff to fear for his life and to believe that he would be outnumbered and cornered on his property, too late to defend himself, if he did not affirmatively act to protect himself and his property from the assailants.

47.     The actions detailed above were performed without legal justification or purpose; they were not necessary for any legally justifiable police action or seizure.

48.     Even if the conduct of Defendant Backer was used in conjunction with a legally cognizable attempt to legitimately seize Mr. Martinez, the force used was wholly unnecessary at the late juncture in which it was utilized, and would have been considered patently unjustifiable absent the dangerous circumstances that the officers created for Mr. Martinez and themselves.

49.     The actions as described herein of Defendant Officers, while acting under color of state law, deprived Plaintiff Martinez of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

50.     The conduct of the Defendant Officers was the motivating and proximate cause of Plaintiff's injuries, including physical, emotional, and dignitary harms.

<u>SECOND CLAIM FOR RELIEF</u>
*Bivens - Federal Fourth and Fourteenth Amendment Deprivation –Malicious Prosecution*
**(Against Defendant Backer, Herrera, and Mitchell)**

51.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

52.     Defendant Backer, Herrera, and Mitchell did not have probable cause to believe Mr. Martinez had committed the crime of assault against a police officer, menacing, or any other related crime. Although Plaintiff had begun running toward the officers with a baseball bat, he

was too far away from the officers to present an actual threat. Moreover, Mr. Martinez quickly abandoned his advance and ran back toward his house. Plaintiff was only attempting to defend himself and his property from persons he reasonably perceived as assailants – as they approached he and his home in stealth.

53.     Knowing that Plaintiff had abandoned his advance toward the officers, and that Defendant Backer had inappropriately shot Plaintiff in the back as he attempted to run away, the officers criminally charged him, conspired with each other, and made false statements that ensured Plaintiff's prosecution for such crimes, anyway, in an attempt to cover-up and conceal their own unlawful and inappropriate acts.

54.     The officers discussed the incident and agreed to communicate false information regarding the incident, including that:

- They had each verbally identified themselves as police officers before the shooting.
- Plaintiff continually advanced upon them, and never turned back, even as Defendant Backer fired his weapon twice; and
- Plaintiff appeared as though he was positioned to swing the bat like a baseball player, within feet of Defendant Backer, at the moment Backer shot him in Plaintiff's front or side.

55.     The Defendant Officers knew or should have known that making such claims would provide false evidence that would result in criminal prosecution.

56.     Despite this knowledge, the Defendant Officers asserted the false information in oral and written form in police statements, to prosecutors, and the court.

57.     The prosecutor undoubtedly relied on these assertions in prosecuting the criminal case; the officers were the primary witnesses and testified several times for the prosecution. The prosecution's legal theory was predicated on the false assertions of the officers.

58.     Plaintiff was ultimately vindicated by a "not guilty" verdict after Plaintiff's counsel demonstrated evidence that Plaintiff was farther away than the Defendant officers claimed at the time of the shooting and the E.R. physician testified that Mr. Martinez was shot in the back, not his front or his side.

59.     The actions as described herein of the Defendant officers, under color of federal law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable seizure and to due process as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States of America, made actionable pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

60.     As a result of the false assertions, and false criminal charges, Mr. Martinez was wrongfully prosecuted, suffered lost liberty, emotional distress, and other costs, inconveniences, and loss of opportunities, as identified above.

### THIRD CLAIM FOR RELIEF
*Negligence Torts Pursuant to Colorado Common Law – Negligent Infliction of Emotional Distress, Danger Creation, and/or General Negligence*
**(Against Defendant United States of America)**

62.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

63.     Defendant Officers unusual approach to a routine "knock and talk" at Plaintiff's residence fell below acceptable law enforcement standards, ignored safe traditional norms of police conduct, and created a significant foreseeable risk of harm to Plaintiff and his guests.

64.     Instead of openly and conspicuously initiating contact with Plaintiff, Defendant Officers elected to aggressively approach the residence in a dangerous clandestine manner, as described above, that created dangerous circumstances for both Plaintiff and the officers.

65. This conduct negligently created a situation where Plaintiff and (possibly) Defendant Officers perceived each other as assailants. Indeed, no reasonable person in Plaintiff's shoes would objectively infer that police officers on official business were likely the clandestine persons approaching, particularly since the officers had earlier approached his residence in a clearly lit police car that directly parked in front of his home, walked to his front door in clearly identifiable police clothing, knocked, and announced themselves as police.

66. But-for the recklessness and/or negligence of Defendant Officers in approaching the home in an aggressive and covert manner and in failing to identify themselves, Plaintiff would not have felt threatened, fearful, or horrified of the danger of imminent bodily harm to the point of feeling that he urgently needed to defend himself and his home from a group of unidentifiable individuals, whose conduct more closely resembled that of thugs than officers of the law; the officers would not likely have felt threatened by Plaintiff's attempt to defend himself.

67. The Defendant Officers' negligent approach to the situation at Plaintiff's residence was a proximate cause of Plaintiff's harms identified above and caused Plaintiff to suffer telltale symptoms of severe emotional distress and substantial mental illness, including severe anxiety, night terrors, flashbacks, loss of appetite and loss/inability to sleep, PTSD and Depression.

68. The United States is vicariously liable, under a theory of *respondeat superior*, for Defendant Officers' tortious conduct and Plaintiff's resulting injuries, as fully set forth throughout this Complaint and pursuant to 28 U.S.C. § 2671 *et seq*

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants and/or against the United States for compensatory damages, as

referenced above, punitive damages, for interest as allowed by law including pre-judgment interest from the date of the incident and post-judgment interest, for costs, expert witness fees, and reasonable attorney fees as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

Respectfully submitted this 27th day of May, 2016.

COUNSEL FOR PLAINTIFF

*s/   Raymond K. Bryant*
Raymond K. Bryant
Civil Rights Litigation Group, PLLC
1391 Speer Blvd., Suite 705
Denver, CO 80204
P:  720-515-6165
F:  303-416-4246
Raymond@rightslitigation.com

### CERTIFICATE OF SERVICE
I hereby certify that on this *27th* day of *May*, 2016, a true and correct copy of **AMENDED COMPLAINT** was filed with the Court and served by ECF and sent to the following:

Patrick Mason
Mason and Isaacson, P.A.
p.mason@milawfirm.net

Amy Padden
U.S. Attorney's Office- Denver
Amy.padden@usadoj.gov

*s/ Raymond K. Bryant*